J-A28012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUCAS ALLEN NEWNAM | : | |
| | : | |
| Appellant | : | No. 1504 MDA 2017 |

Appeal from the Judgment of Sentence August 9, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0003420-2016

BEFORE:  LAZARUS, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:          **FILED JANUARY 25, 2019**

Lucas Allen Newnam appeals from his judgment of sentence, entered in the Court of Common Pleas of Lancaster County, following his conviction of first-degree murder.[1]  Newnam was sentenced to life imprisonment, without the possibility of parole.  After careful review, we affirm.

On May 27, 2016, Newnam fatally shot Julius Dale, III, at Newnam's residence located at 304 Creek Road, Sadsbury Township, in Lancaster County.  We refer to pages 2-11 of the attached trial court opinion, dated December 20, 2017, for a recitation of the relevant trial testimony and factual background of the case.

Following a five-day jury trial, first-degree murder conviction, and sentencing, Newnam filed timely post-sentence motions alleging the verdict

_____

[1] 18 Pa.C.S.A. § 2502(a).

was against the weight of the evidence and that the Commonwealth provided insufficient evidence to disprove his defense of justification. The court denied the motion and, on September 20, 2017, Newnam filed the instant, timely notice of appeal. After being granted an extension by the trial court, Newnam filed a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

On appeal, Newnam raises the following issues for our consideration:

(1) Did the trial court commit reversible error by denying [Newnam's] request to have newly[-]retained counsel of his choice assume his defense of his pending murder trial and afford counsel a brief continuance to prepare, where [Newnam's] original attorney abruptly withdrew from his case for medical reasons and the court appointed new counsel to [Newnam's] case[?]

(2) Did the trial court err when it allowed the Commonwealth to introduce [Newnam's] intercepted prison visit conversations, in the absence of explicit consent by both parties or judicial authorization, in violation of the Wiretap Act, 18 Pa.C.S. [§] 5701, et se[q]., and **Commonwealth v. Fant**[, 146 A.3d 1254 (Pa. 2016)?]

(3) Did the trial court err when it refused to suppress [Newnam's] statements during a custodial interrogation when the state police troopers failed to properly inform him of the nature of the investigation prior to advising [Newnam] of his **Miranda**[2] rights[?]

(4) Did the trial court err by refusing to charge the jury pursuant to [Newnam's] requested castle doctrine instruction when [Newnam] testified, as well as put on witnesses buttressing

_____

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

>       his claim of self-defense and the decedent's stated intent to
>       kill [Newnam?][3]

Appellant's Brief, at 7-9.

In his first issue on appeal, Newnam contends that the trial court improperly denied his request to have newly-retained, private counsel appointed and permit counsel to have a brief continuance to prepare his case. He asserts the denial was an abuse of discretion where Newnam's original attorney withdrew from his case for medical reasons and the court appointed new counsel for him, depriving him of his right to choose counsel.

It is a fundamental principle that a defendant has a constitutional right to choose any lawyer he may desire, at his own cost and expense. **Commonwealth v. Rucker**, 761 A.2d 541 (Pa. 2000); Pennsylvania Constitution, Art. I, § 9; U.S. Constitution, Amend. V. **Cf. Commonwealth v. Moore**, 633 A.2d 1119, 1125 (Pa. 1993) (citing **Commonwealth v. Johnson**, 236 A.2d 805, 807 (Pa. 1968) (defendant who is not employing counsel at own expense and seeks court-appointed counsel, at public expense, does not have right to choose particular counsel to represent him)). In

---

[3] The Commonwealth has presented our Court with a post-submission communication, attaching a recent decision, **Commonwealth v. Cannavo**, 3729 EDA 2017 (Pa. Super. filed Dec. 3, 2018), that addresses the castle doctrine and 18 Pa.C.S. § 505. The Commonwealth asserts that **Cannavo** is relevant to our analysis of Newnam's last issue on appeal. **See** Pa.R.A.P. 2501 (after argument of case, no brief, memorandum or letter relating to case shall be presented either directly or indirectly to court or any judge, *except upon application* or when expressly permitted to bar at time of argument) (emphasis added). We accept the submission pursuant to Rule 2501.

***Commonwealth v. Robinson***, 364 A.2d 665, 674 (Pa. 1976), our Supreme

Court noted:

> Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his own choice to prepare and conduct his defense; the constitutional mandate is satisfied so long as the accused is afforded a fair or reasonable opportunity to obtain particular counsel, provided there is no arbitrary action prohibiting the effective use of such counsel.

***Id.*** at 674 (citations omitted).

However, a person's right to be represented by the counsel of his choice is not absolute. "[T]he right of the accused to choose his own counsel, as well as a lawyer's right to choose his clients, must be weighed against and may reasonably be restricted by 'the state's interest in the swift and efficient administration of criminal justice.'" ***Id.*** at 676. Effectively, a defendant cannot "utilize his right to choose his own counsel so as *unreasonably* to clog the machinery of justice and hamper and delay the state in its efforts to do justice with regard to both him and to others whose right to a speedy trial may thereby be affected." ***Id.*** (citations omitted) (emphasis in original).

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. *The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.*

*Id.* at 675 (emphasis added). Moreover, in ***Commonwealth v. Brooks***, 104 A.3d 466 (Pa. 2014), our Supreme Court noted that:

> [a]ppellate review of a trial court's continuance decision is deferential. The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. An abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record.

*Id.* at 469.[4] Our federal courts have recognized that a defendant must be "given a reasonable time and a fair opportunity to secure counsel of his [or her] own choice, ***Chandler v. Fretag***, 348 U.S. 3, 10, (1954), that this right cannot be insisted upon in a manner that will obstruct a reasonably prompt trial, ***Releford v. United States***, 288 F.2d 298, 301 (9th Cir., 1961), and that [a defendant cannot be] deprived of his [or her] constitutional right to have assistance of counsel at his [or her] trial. In ***United States ex rel. Puntari v. Maroney***, 220 F. Supp. 801, 805 (W.D. Pa. 1963), the United States District Court for the Western District of Pennsylvania, held that "[a]n accused without [] sufficient funds who failed to engage counsel of choice within a 70-day period prior to trial must rely on court-appointed counsel if he desires an advocate. He does not have the right to tell the court whom to appoint, the choice is that of the court. *Id.* at 805.

---

[4] We note that pursuant to Pa.R.Crim.P. 106, "a court may grant a continuance 'in the interests of justice.'" Pa.R.Crim.P. 106(A). In addition, "[a] motion for continuance on behalf of the defendant shall be made not later than 48 hours before the time set for the proceeding." *Id.* at 106(D).

Here, Newnam's original trial counsel, Randall Miller, Esquire, who was court-appointed on July 28, 2016, and was fully prepared to go to trial, had to withdraw from the case just ten days shy of trial, in April 2017, due to medical reasons. On April 27, 2017, the court quickly appointed new counsel for Newnam, Edwin Pfursich, Esquire, who requested a two- or three-month continuance to properly prepare a defense for trial. The court granted the unopposed motion for a 60-day continuance and trial was rescheduled for July 29, 2017. During the following two months, Newnam became increasingly dissatisfied with Attorney Pfursich's representation. As a result, he retained new, private counsel, Michael V. Marinaro, Esquire, on July 19, 2017 – just ten days before his scheduled trial.

On July 20, 2017, the court held a hearing on Newnam's change of counsel and intended request for an additional two- to three-month continuance. The court noted at the hearing that the court's continuance decision would be based on the following facts: the case had already been continued one time; that continuance was on the defense because of the appointment of new counsel; the continuance was for two months; the case was now 14 months old; Newnam had more than one year to secure private counsel; Newnam secured private counsel only eight days before the rescheduled trial start date; Newnam had been in court on several occasions over the prior nine months and never indicated that he intended to hire private counsel or that he was dissatisfied in any way with Attorney Pfursich; and that

the Commonwealth has already subpoenaed and met with witnesses for trial. N.T. Hearing, 7/20/17, at 3-6.

Current counsel, Attorney Pfursich, testified at the hearing that while he and his client disagreed over trial strategies, Newnam never personally indicated to him that he wanted to hire private counsel. He did state, however, that Newnam's family mentioned on a number of occasions that they were dissatisfied and were seeking to hire Newnam new counsel. Attorney Pfursich also told the court that he was prepared to go to trial at the end of July, that he did not believe that Newnam was hiring new counsel as a delay tactic, that Newnam had no reason to hire private counsel during the first year that the case was pending because he was satisfied with Attorney Miller, and that from experience he knew it required substantial effort to interview new attorneys and secure funding for private counsel in a murder case. *Id.* 10-14. The court also noted that if it did continue the case, it would not be able to reschedule trial before October, approximately 17 months after the criminal complaint was filed. *Id.* at 5.

Newnam's intended private counsel, Attorney Marinaro, indicated that without a continuance there was "no possible way that [he could] get up to speed at this point to be an effective attorney for [Newnam]" and would need two to three months to prepare for trial. *Id.* at 10-11.

Our Courts have repeatedly stated that upon review of the denial of a continuance motion, "we are to give attention to the 'reasons presented to the trial judge at the time the request is denied.'" ***Commonwealth v. Wolfe***,

447 A.2d 305, 308 (Pa. Super. 1982). Instantly, Newnam testified that he waited so long to hire private counsel after Pfursich was hired because he "didn't have the funds." *Id.* at 17. Newnam also testified that he did not speak up sooner and express his dissatisfaction with Attorney Pfursich at prior hearings because he was afraid he would be held in contempt of court for speaking out of turn. *Id.* at 18. He also indicated that counsel had not given him access to a witness statement and that counsel "didn't seem as enthusiastic about defending [his] case as [he] thought counsel should be." *Id.* at 22-23.

Finally, the assistant district attorney testified that he had no way of knowing if the Commonwealth's witnesses would be available if the trial were continued until October, *id.* at 36, the Commonwealth would not suffer any substantial prejudice if trial were continued, *id.* at 37, and it was not opposed to a continuance *as long as Attorney Pfursich did not leave the case*. *Id.* at 38.

In **Commonwealth v. Prysock**, 972 A.2d 539 (Pa. Super. 2009), our Court set forth the following factors to consider on appeal from a trial court's ruling on a continuance motion to obtain private representation: (1) whether the court conducted "an 'extensive inquiry' into the underlying defendant's dissatisfaction with current counsel;" (2) whether the defendant's dissatisfaction with counsel amounted to "irreconcilable differences;" (3) "the number of prior continuances;" (4) "the timing of the motion" for continuance; (5) "whether private counsel had actually been retained;" and (6) the

readiness of private counsel to proceed in a reasonable amount of time. *Id.* at 543.

Here the trial court conducted a thorough inquiry regarding why Newnam was dissatisfied with Attorney Pfursich; the court did not believe that Newnam's dissatisfaction constituted "irreconcilable differences;" a continuance was being sought one week before scheduled trial; private counsel had already been retained; new counsel was not immediately ready to proceed, but would need two to three additional months to prepare for trial. *Prysock*, *supra*. The court ultimately concluded that "[Newnam's] right to counsel of his choice was not exercised in a reasonable time and manner when weighed against the public need for the efficient and effective administration of justice." *See* Trial Court Opinion and Order, 7/21/17. Consequently, counsel's motion to withdraw was denied because granting it would have required a trial continuance. *Id.*

A comprehensive review of the record indicates that the trial court properly weighed Newnam's right to counsel of his choice against the state's interest in the efficient administration of justice. In *Commonwealth v. Harding*, 369 A.2d 429 (Pa. Super. 1959) (en banc), our Court noted that "[i]t is necessary to balance the desirability of permitting a defendant additional time to retain private counsel against the equally desirable need for efficient and effective administration of justice. The accused's right to select his own counsel cannot be exercised in a manner that will obstruct an orderly

procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same." *Id.* at 430.

Here, the court did not deny the appointment of private counsel, so much as it did not sanction a two to three month delay in bringing the case to trial. In fact, the court was willing to permit Attorney Marinaro to represent Newnam, so long as he was ready to go to trial on the scheduled date. Admittedly, this is a close case. We do not find that Newnam was intentionally trying to delay trial in bad faith, **Commonwealth v. Ross**, 350 A.2d 836 (Pa. 1976), or that he *unreasonably* clogged the machinery of justice by his request. **Robinson**, **supra**, at 674. However, we cannot conclude that the court's denial of Newnam's requires rises to the level of a deprivation of due process or an abuse of the trial court's discretion. **See Brooks**, **supra** (defining abuse of discretion as "a manifestly unreasonable judgment, a result of prejudice, bias or ill-will, or a misapplication of law.").[5]

The Commonwealth's acquiescence to a continuance was equivocal where the assistant district attorney first stated that he "certainly would not be opposed to a continuance . . . if Mr. Marinaro [were] granted permission to enter[,]" N.T. Hearing, 7/20/17, at 37, and then, only moments later, stated that if having Mr. Pfursich leave the case would result in a continuance, he

---

[5] We remind the trial court that in future cases it must be sure to take all factors into consideration when ruling on a defendant's request to secure private counsel, including the gravity of the offenses lodged against the defendant, his reasons for securing new counsel and the reason why any prior continuances were granted for the defense.

would be opposed to having him leave the case. *Id.* at 38. Moreover, the Commonwealth did not definitively state that it would not be prejudiced where the assistant district attorney stated at the hearing that he could not "speak [as] to how successful [it would] be at staying in contact with [the witnesses] between [then and the rescheduled trial date in the fall]" and qualified this statement with the fact that many of the witnesses "do not have steady addresses or steady phone numbers" and "getting them to stay . . . in touch with [the Commonwealth] can be a bit of a challenge." *Id.* at 37. Accordingly, we affirm the trial court's decision to deny Newnam's continuance.

In his next issue on appeal, Newnam contends that the trial court erred when it denied his motion[6] *in limine* and permitted the Commonwealth to introduce several non-contact, intercepted prison visit conversations without first obtaining explicit consent by both parties or judicial authorization, in violation of the Wiretap Act ("the Act"), specifically 18 Pa.C.S. § 5704(14). We disagree.

Because Newnam was on non-contact status while incarcerated and awaiting trial on the instant homicide charge, all of his visits took place in the non-contact visitation room where he sat face-to-face with his visitors, on opposite sides of a pane of glass, and talked to them through telephone-style handsets. All of these non-contact conversations were recorded; bilingual

---

[6] On May 5, 2017, Newnam filed a motion *in limine* to preclude the Commonwealth from admitting "visit conversations inside Lancaster Prison" as a violation of the Wiretap Act. We equate this motion to, and treat it as, a motion to suppress the conversations.

signage on both sides of the glass pane notified inmates and visitors of the fact that their conversations may be recorded. Further, when Newnam and his visitors picked up the handsets, an audio recording informed them that, "This call is subject to recording and monitoring."

> When reviewing a grant of a suppression motion, the appropriate scope and standard of review are as follows:
>
>> [W]here a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.
>>
>> Moreover, if the evidence supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings.

*Commonwealth v. Burgos*, 64 A.3d 641, 647 (Pa. Super. 2013) (quotation omitted). Moreover, interpreting the language of Pennsylvania's Wiretap Act is a pure question of law and, thus, demands a *de novo* standard of review. *Commonwealth v. Deck*, 954 A.2d 603, 606 (Pa. Super. 2008).

Pennsylvania's Wiretapping and Electronic Surveillance Control Act generally prohibits intercepting, using, or disclosing communications except those according to specified procedures. *See* 18 Pa.C.S. § 5703, et. seq. The Act is designed to safeguard individual privacy, while also giving law enforcement authorities a tool to combat crime. Consistent with the Act's

emphasis on privacy, its provisions are to be strictly construed. Section 5704 of the Act provides, among others, two relevant exceptions to the general prohibition on intercepting communications. One exception, memorialized in section 5704(4) of the Act, does not make it unlawful and requires no prior court approval for the interception of communications "where all parties to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4). The other relevant exception allows employees of county correctional facilities to "intercept, record, monitor and or divulge any telephone calls[7] from or to an inmate in a facility" so long as inmates are notified in writing that their telephone conversations "may be intercepted, recorded, monitored or divulged" and that after the interception or recording only designated official personnel may have access to that recording. *See* 18 Pa.C.S. § 5704(14)(i). Moreover, under section 5704(14)(iii), "[p]ersons who are calling **into** a facility to speak to an inmate shall be notified that the call

_____

[7] In 2017, section 5704 was amended, effective on September 5, 2017 – exactly one month after Newnam's trial concluded and he was sentenced. The relevant 2017 amendment to section 5704(14) substituted "oral communication, electronic communication or wire communication for "telephone calls." More specifically, section 5704(14)(iii) now provides:

> (iii) Persons who are engaging in an oral communication, electronic communication or wire communication with an inmate shall be notified that the communication may be recorded or monitored. Notice may be provided by any means reasonably designed to inform the non-inmate party of the recording or monitoring.

18 Pa.C.S. § 5704(14)(iii).

may be recorded or monitored." 18 Pa.C.S.A. § 5704(14)(iii) (emphasis in original). Use of the word "into" in section 5704(14)(iii) contemplates a call originating outside the prison. *Fant*, 146 A.3d at 1262.

In *Fant*, the Pennsylvania Supreme Court defined the term "telephone call" under the Act as a communication that: (1) involves the dialing of a telephone number[;] (2) involves an apparatus that is connected by wire or the like to a telephone company[; and] (3) permits a caller to converse with a call recipient whose similar apparatus is associated with the dialed telephone number." *Id.* at 1263. In *Fant*, where the subject communications did not go through a telephone company, telephone company lines, or equipment outside the prison, only a personal ID number (not a telephone number) was used to activate the visit conversation, and the recordings of the visit conversations were saved to a prison computer server, the subject conversations were not subject to the county correctional facility "telephone" exception of the Act. *Id.* at 1265. Similarly, here the subject conversations did not go through a telephone company, telephone company lines, or equipment outside the prison, and only a personal ID was used to activate the conversation. Thus, the Act's section 5704(14)(iii) exception is not applicable to the instant matter.

However, our Court has held that any expectation of privacy that an inmate has in a conversation taking place in a prison visitation room, when separated from the visitor by a glass partition and speaking with the visitor through a closed-circuit telephone system, is unreasonable. ***See***

*Commonwealth v. Prisk*, 13 A.3d 526, 532 (Pa. Super. 2011) (unreasonable for inmate to expect privacy in conversations that take place in prison visitation room; such expectation of privacy is not one society is prepared to recognize). Moreover, Robert Barley, an inmate disciplinary coordinator and investigative assistant at Lancaster County Prison where Newnam was housed at the time of the recorded conversations, testified that in the no-contact area there are "several phones[8] on one side of the glass, along with several phones on the other side of the glass [and] right above the phone[s] is a [sign] that talks about the inmate's phones may be recorded, monitored or divulge[d]." N.T. Hearing, 5/5/17, at 4-5. The signs are written in English and Spanish and are located on both sides of the glass partition above the phones. *Id.* at 5. Moreover, after the inmate enters his or her passcode on the phone, a recording audibly informs the listeners that the calls may be intercepted, monitored, or divulged at any time. *Id.* at 9.

We find that the phone calls admitted at trial fall within the Act's section 5704(4) exception, where both Newnam and visitors were given written and aural notice that their communications may be recorded. *Commonwealth v. Byrd*, 185 A.3d 1015 (Pa. Super. 2018) (two-party consent exception to Wiretap Act applied to inmate-visitor conversations where, before inmate and visitor could converse, recording stating visit may be recorded or monitored

_____

[8] A separate, independent phone is used for attorney conversations with inmates. No conversations, which are considered privileged attorney-client communications, are recorded on those phones. *Id.* at 7-8.

was played, visitor acknowledged that she heard prerecorded message and still decided to speak with inmate; Court found hyper-technical analysis of "consent" under section 5704(4) unreasonable). To require more evidence of "explicit" consent, as is suggested by Newnam, would elevate form over substance and give "inmate[s] [the opportunity to] easily avoid the consent element by simply holding the phone away from [their] ear[s] for a period of time prior to speaking with a visitor" or by stating that they did not read the posted signs. *Id.* at 1022.

In his next claim, Newnam argues that the trial court erred when it refused to suppress his statements made during a custodial interrogation, when the state police troopers failed to properly inform him of the nature of the investigation prior to advising Newnam of his **Miranda** rights.

After a review of the record, relevant case law and the parties' briefs, we rely on the trial court's Rule 1925(a) opinion to conclude that Newnam effectuated a valid waiver and was not improperly subjected to a custodial interrogation. **See** Rule 1925(a) Trial Court Opinion, 12/20/17, at 30-35. Here, the officers clearly told Newnam the direction and purpose of their questioning after they advised him of his **Miranda** rights but, critically, *before* they began their interrogation. Moreover, Newnam was apprehended in close proximity to the shooting scene and the questioning took place less than one day after the murder. **See Commonwealth v. Green**, 683 A.2d 659 (Pa. Super. 1996) (no requirement that suspect have knowledge of specific crimes about which he or she is to be questioned); **Commonwealth v. Travaglia**,

467 A.2d 288 (Pa. 1983) (fact that interrogation follows hard upon criminal episode and there is no circumstance lending ambiguity to direction and purpose of questioning may suffice as necessary evidence that defendant knew of occasion for interrogation).

In his final claim on appeal, Newnam contends that the trial court erred by refusing to charge the jury on the "castle doctrine" when Newnam testified and presented supporting witnesses to buttress his claim of self-defense and the decedent's stated intent to kill him. In essence, he alleges that he had a reasonable belief that the use of deadly force was immediately necessary to protect himself from the victim inflicting serious bodily injury or death upon him. Again, we rely upon the trial court opinion to dispose of this issue on appeal. *See* Rule 1925(a) Opinion, 12/20/17, at 35-40.

Our standard of review in regard to a trial court's decisions on jury instructions is well-settled. "[W]hen considering the denial of jury instructions[,] . . . an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 985 A.2d 783, 788-89 (Pa. 2009). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Commonwealth v. Hamilton*, 766 A.2d 874, 878 (Pa. Super. 2001).

The castle doctrine "is an evidentiary means by which a defendant may attempt to prove justification by self-defense." *Commonwealth v. Cannavo*, 2018 PA Super. 327 (Pa. Super. filed Dec. 3, 2018). Specifically,

it "is a specialized component of self-defense, which recognizes that a person has no duty to retreat from his or her home before using deadly force as a means of self-defense." ***Commonwealth v. Childs***, 142 A.3d 823, 824 n.1 (Pa. 2016) (citations omitted).[9]  Standards for permitting a castle doctrine instruction are the same as when reviewing whether a self-defense instruction is appropriate. Thus, a "valid claim of . . . the castle doctrine must be made out as a matter of law, and this determination must be made by the trial judge." ***Id.*** at \*6.  In essence, the court must determine whether there was any evidence to justify the instruction.

Here, there was no evidence to support a finding that the victim unlawfully or forcefully entered Newnam's residence.   Moreover, ample evidence existed to prove that Newnam's residence was being used for illegal drug trafficking.   Both of these facts negate the applicability of the castle doctrine. ***See*** 18 Pa.C.S. §§ 505(b)(2.1)(i), 505(b)(2.2)(iii).   Thus, the court did not err in failing to give a castle doctrine instruction.

Judgment of sentence affirmed.

_____

[9] The Castle Doctrine, originally a common law doctrine, was codified in Pennsylvania in 1972 with the enactment of 18 Pa.C.S. § 505.  In June 2011, the legislature passed Act 10, which did not substantively alter the law regarding the use of deadly force within one's residence.  Both the former and current section 505(b)(2)(ii) provide that a person may use deadly force if he or she believes that it is necessary to prevent death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat, and that there is no duty to retreat from the person's dwelling or place of work unless that person is the initial aggressor or is assailed by a person who also works in the same place. ***Childs***, ***supra*** at 829-30.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/25/2019

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**C R I M I N A L**

COMMONWEALTH OF PENNSYLVANIA

v.

LUCAS ALLEN NEWNAM

1504 MDA 2017

CP-36-CR-0003420-2016

:

:

**PA R.A.P. 1925 OPINION**

BY TOTARO, J.

On July 31, 2017, Lucas Allen Newnam ("Appellant") appeared before the court for trial on one count of criminal homicide,[1] for allegedly causing the death of Julius Dale, III ("victim") on May 27, 2016, at 304 Creek Road, Sadsbury Township, Lancaster County, Pennsylvania. (Notes of Testimony at 29, 32) (hereinafter "N.T."). At the conclusion of a five-day jury trial, Appellant was found guilty of murder of the first degree.[2] *Id.* at 861. On August 9, 2017, Appellant was sentenced to a mandatory term of life imprisonment without the possibility of parole. *See* Sentencing Order.

On August 9, 2017, Appellant filed a post-sentence motion alleging the verdict was against the weight of the evidence presented at trial and "[n]o reasonable jury could have concluded that the Commonwealth disproved beyond a reasonable doubt Defendant's proffered defense of Justification." *See* Post-Sentence Motion. Appellant asked the court to grant his Motion for Judgement [sic] of Acquittal. *Id.* The Commonwealth filed a response in opposition, and on August 22, 2017, the court issued an order denying the Motion. *See* Order, 8/22/17.

---

[1] 18 Pa.C.S.A. § 2501(a).

[2] 18 Pa.C.S.A. § 2502(a).

On September 20, 2017, Appellant filed the instant Notice of Appeal to the Superior Court of Pennsylvania. On October 13, 2017, Appellant filed a Motion for Extension of Time to File Statement of Errors Complained of on Appeal ("Statement"), and the court granted him an additional thirty days to file the Statement. *See* Order, 10/13/2017. On November 13, 2017, Appellant filed a Statement setting forth the following allegations of error: (1) Appellant's request to have new counsel assume his defense should have been granted and new counsel should have been afforded a continuance to prepare for trial; (2) the trial court erred when it allowed the Commonwealth to introduce Appellant's intercepted prison visit conversations; (3) Appellant's suppression motion should have been granted and his custodial interrogation should have been suppressed; (4) the trial court erred by refusing to charge the jury pursuant to Appellant's requested castle doctrine instruction; and (5) the trial court erred by allowing the Commonwealth to introduce evidence of Appellant's prior drug dealing activity. *See* Statement.

This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.[3]

## **TESTIMONY**

Daniel Umble testified at trial that he moved to 304 Creek Road in October 2015. (N.T. at 183-84). He and Appellant rented the house together. *Id.* at 186. A couple months before the shooting, Appellant gave the victim permission to move into the house, and the victim was there

---

[3] On November 9, 2017, the trial court sent a letter to the Prothonotary of the Superior Court of Pennsylvania requesting additional time to submit the original record and opinion due to the extension the trial court gave to Appellant in filing his Statement. Thereafter, on November 27, 2017, the Superior Court issued an order dismissing the appeal for Appellant's failure to comply with Pa.R.A.P. 3517. An Application to Reinstate Appeal was filed by Appellant on November 28, 2017, and the Superior Court issued an order on December 5, 2017 vacating the order of November 27, 2017 and reinstating the appeal.

2

every day. *Id.,* at 186, 212. According to Umble, Appellant and the victim both sold drugs out of the house, and it was "the only thing anybody did in the house to make money other than me." *Id.* at 187-88. On May 27, 2016, Umble was working in the garage when he heard Appellant and the victim arguing. *Id.* at 188, 193-96. Umble saw Appellant come out of the house holding a sawed-off shotgun, and heard him yell for Umble to "get him out of the house or I'm gonna kill him." *Id.* at 196-97, 200-01. Umble could not see the victim. *Id.* at 200. Umble then heard a gunshot. *Id.* at 196, 202. When he walked up to the house, Umble saw the victim laying dead in the threshhold of the basement door and Appellant still had the shotgun in his hands. *Id.* at 203. At no time did Umble hear Appellant say anything to indicate he was in fear. *Id.* at 202.

Mark Porter testified that he also lived at 304 Creek Road with Appellant and the victim. (N.T. at 258). Appellant, who had no other job, sold drugs out of the house. *Id.* at 261. The victim sold drugs as well, and Porter believed he was in business with Appellant. *Id.* at 262. On May 27, 2016, Porter returned from the store and saw Appellant and the victim playing outside with fireworks. *Id.* at 266. They were then hanging out together in the basement area, and there was no sign of conflict. *Id.* at 267-70. The victim had a handgun in a holster on his side. *Id.* at 270. Porter then walked down to the garage, and shortly thereafter he heard Appellant yelling at the victim for betraying him. *Id.* at 273-74. Appellant sounded angry, and at no time did he say anything that would suggest he was in fear. *Id.* at 274-75. Porter heard Appellant yell for Umble to come and get the victim out of his face, followed by a gunshot. *Id.* at 275. Porter did not see either individual, nor did he see what occurred. *Id.*

Anthony Williams testified that he frequently visited 304 Creek Road, where both the victim and Appellant lived and sold drugs. (N.T. at 129-31, 134-35). Appellant kept his drugs in

3

a safe in the basement and operated a surveillance system. *Id.* at 135-37. Williams stated that a conflict arose between Appellant and the victim days before the shooting because Appellant became aware the victim was going behind Appellant's back to buy drugs. *Id.*

On May 27, 2016, Williams arrived at the residence and heard arguing. (N.T. at 140-42). Williams saw Appellant and the victim emerge from the basement door, at which time Appellant had his back to the victim. *Id.* at 145-46. Appellant was very agitated and he was holding a firearm. *Id.* at 146. Appellant kept repeating that the victim had betrayed him, and he told the victim to leave. *Id.* at 147. The victim, who seemed remorseful, refused to leave because it appeared he wanted to work things out. *Id.* Appellant told the victim two or three times to leave or Appellant would shoot him. *Id.* at 147-48. Appellant also called for Dan Umble to remove the victim from the property. *Id.* at 148. Appellant then turned around to face the victim, pulled the trigger without hesitation, and shot the victim. *Id.* at 149.

Williams had a clear view of the Appellant and the victim during the entire incident. (N.T. at 149). When he was shot, the victim did not have anything in his hands, he did not reach for anything at any point, and he did not say anything threatening to Appellant. *Id.* at 151-52. The victim was gesturing with his hands, but the gestures did not seem threatening or aggressive. *Id.* at 152. At no time did Williams hear Appellant say anything that would suggest he was in fear of the victim. *Id.* at 154. Appellant then yelled for everyone to help him drag the body into the woods and told them to give up their keys and cellphones. *Id.* Williams put his keys and cellphone on the ground, then backed up slowly down the walkway. *Id.* at 155-56.

Rachel Long testified that she knew Appellant for four or five years, and she was aware he was selling drugs out of 304 Creek Road. (N.T. at 227-28). While Long was at the residence

4

with her son on May 27, 2016, she saw the victim wearing a holster with a handgun on the outside of his clothing. *Id.* at 234. He had just recently started wearing the gun. *Id.* Long did not believe there was anything unusual about his demeanor. *Id.* Long also saw Appellant, who told her she should not have her son "at a drug house." *Id.* at 235. Later that day, while Long was on the third-floor of the house, she heard Appellant and the victim arguing below. *Id.* at 236. Specifically, she heard Appellant yelling that the victim had betrayed him. *Id.* At no time did Long hear Appellant say anything that would suggest he was in fear. *Id.* at 237. Long then heard a gunshot. *Id.* at 238.

Erin Houck testified that she lived at 304 Creek Road with Appellant and the victim, who were both in the business of selling drugs out of the house. (N.T. at 288-89, 293-95). On May 25, 2016, the victim informed Houck that he bought drugs from Appellant's mother. *Id.* at 297. While doing so, the victim pulled out a gun and stated that he would kill Appellant. *Id.* at 297, 325. Houck warned Appellant about the threat that same day. *Id.* at 334, 336. On May 26, 2016, Appellant and the victim got into an argument because the victim was buying drugs from Appellant's mother, and Appellant did not approve. *Id.* at 296. Appellant repeatedly told the victim to leave the house. *Id.* at 296-97, 326-29.

On May 27, 2016, Houck awoke around 12 noon and saw that the victim had returned to the residence. (N.T. at 299). She did not recall whether he was still wearing a gun. *Id.* at 300. Appellant was still sleeping. *Id.* The victim decided to wake Appellant because it was Friday and it was time to make money by selling drugs out of the house. *Id.* at 302. The victim was loud and animated, but he was not violent or aggressive in any way. *Id.* at 303. When he was awakened, Appellant told the victim he had to leave or give Appellant his gun. *Id.* at 307. The

5

victim declined. *Id.* The victim was known to wear a gun on his hip, but Houck did not see the

victim with a gun that day, nor did she hear him threaten Appellant with a gun. *Id.* at 307, 310,

331-32. Houck also did not see the victim do anything that was threatening. *Id.* at 335.

Appellant had a gun strapped around his neck. *Id.* at 308.

Houck went from the basement where Appellant and the victim were located to the third-

floor of the house, at which time she heard Appellant yell for Dan Umble to "get him the hell out

of here." (N.T. at 308-09). Houck then heard a gunshot, followed by Appellant demanding that

everyone give him their cellphones. *Id.* at 309-10. Houck did not see the shooting. *Id.* at 311.

At no time during the argument did Houck hear Appellant ask the victim to put down a gun,

show his hands, or say anything that would indicate Appellant was in fear of the victim. *Id.* at

310. When she looked out a window, Houck saw Appellant was still armed with a gun. *Id.* at

312-13. When she left the residence, Houck saw the victim laying in a doorway. *Id.* at 316.

Trooper Jordan Hoffman of the Pennsylvania State Police ("PSP") testified that on May

27, 2016, at around 6:25 p.m., he was dispatched to a shots-fired call in the area of 304 Creek

Road, Sadsbury Township, Lancaster County, Pennsylvania. (N.T. at 374-75). Hoffman

described the area as "very heavily wooded." *Id.* at 376. Upon arrival, Hoffman met with two

Christiana police officers who told him there was a possible shooting with a victim. *Id.* at 375-

77. Music was playing and the doors to the garage and house were open. *Id.* at 366-68.

Hoffman heard a radio transmission from Trooper Andrew Knepp, who was with the

party who reported the incident, so Hoffman moved south to meet Knepp. (N.T. at 377-78).

Hoffman was told by the reporting party, later identified as Erin Houck, that she heard a gunshot

and heard what sounded like a body hitting the floor. *Id.* at 378-79. When Hoffman asked

6

Houck where the shooter was, Houck indicated that he was either in the house or in the surrounding area. *Id.* at 379.

Hoffman arrived back at 304 Creek Road at the same time Trooper Curtis Matthews was arriving. (N.T. at 380). Because a possible victim from the shooting could be within the residence, the troopers and Christiana police officers decided to search the nearby garage and residence looking for the shooter or the victim, but neither were found. *Id.* at 380-81.

While a perimeter was being set up around the house, Trooper Adam Shutter located a blue tarp outside the front of the house that looked as if it was covering a body. (N.T. at 383). Shutter and other officers removed the tarp, at which time they located the deceased victim. *Id.* at 401. The victim's skin was ashen in color, he had no pulse, and he had sustained a gunshot wound. *Id.* Matthews removed a wallet from the victim's pants pocket and identified him as Julius Dale. *Id.* at 403.

After the body was discovered, officers launched an unsuccessful search for the suspect in the woods. (N.T. at 384). Thereafter, the PSP Special Emergency Response Team ("SERT") was activated. *Id.* at 384-85. At approximately 7:30 a.m. the following morning, Trooper John Chulock saw a person moving in the woods who matched the physical description given of the suspect. *Id.* at 424. When Chulock took that individual into custody, the suspect gave a fake name and two different dates of birth. *Id.* at 424-25. The suspect was then positively identified as Lucas Newnam. *Id.* at 426.

Trooper Michael A. Snyder testified that he was the lead investigator in this case. (N.T. at 429-30). Shortly after Appellant was taken into custody, Snyder and Trooper Chadwick Roberts interviewed Appellant in the interview room at the PSP Lancaster barracks. *Id.* at 431.

7

The interview began at approximately 8:30 a.m., about one hour after Appellant's apprehension. *Id.* Prior to beginning the interview, Snyder read Appellant his *Miranda* rights with the aid of a PSP Rights Warning and Waiver *Miranda* form. *Id.* at 432-34; (Com. Exh. #10). Appellant signed the form, waived his right to counsel, and agreed to answer questions. (N.T. at 433-34). Appellant was alert, coherent, and not intoxicated. *Id.* at 435. The entire interview was audio and visually recorded. *Id.* at 436-37; (Com. Exh. #11).

In relation to his interview, Appellant testified at trial that he initially told police he did not live at 304 Creek Road, non-white people came to the house and were hassling the victim over drug money, Appellant fled the house before anything happened to the victim, he denied knowing what happened, and he repeatedly swore he did not shoot the victim. (N.T. at 687-88). However, Appellant told the jury he lied and made up a story. *Id.* at 658. As Appellant stated, "most of that was totally bullshit on my behalf." *Id.* Appellant claimed he eventually told police the truth, that he was acting in self-defense. *Id.* at 659.

During his testimony, Appellant also stated that he had been selling marijuana and methamphetamine for one year because he had no other source of income. (N.T. at 625-26). Selling drugs was a long-term productive way to make a living, and it was "easier than actually working." *Id.* at 627. Dan Umble also sold drugs out of the house. *Id.* at 626-27.

Furthermore, Appellant related that he allowed the victim to stay at 304 Creek Road rent free, and he gave the victim drugs so the victim could resell for profit. (N.T. at 622-24, 627). As stated by Appellant, "[s]everal times I tried to get him on his feet, because he just couldn't find a way to generate any income. And I'd give him a certain quantity of drugs at half street value, and I provided him with multiple cellphones that people would call and request drugs and tell him

8

just to go take care of that. He never really got any traction." *Id.* at 627. Appellant noted that the victim would use some of the drugs intended for distribution, which would prevent him from effectively dealing drugs. *Id.* at 628. For that reason, the victim ended up owing Appellant $1,200. *Id.*

Appellant told the jury that one day prior to the shooting, he and the victim got into an argument because the victim was stealing drugs from Appellant. (N.T. at 634-36). Because selling drugs was how Appellant paid the bills, Appellant asked the victim to leave and not come back. *Id.* at 635-37. The victim eventually left. *Id.* at 635. However, while Appellant was waiting for more people to come and buy drugs, the victim returned. *Id.* at 637. Appellant again made it clear that the victim had to leave permanently, and the victim left again. *Id.* at 637-38.

On May 27, 2016, Appellant stated the victim woke him by knocking on his bedroom door. (N.T. at 638-39). Appellant tried to ignore the victim but eventually they began arguing about the theft. *Id.* at 639-40. According to Appellant, the victim was high and jumpy, and he had a gun on his hip. *Id.* at 640-43. Appellant admitted yelling that the victim had betrayed him, because the victim was stealing "stuff" from the house and Appellant heard that the victim was threatening his life. *Id.* at 645. While inside the basement, the victim poked Appellant in the chest, and Appellant picked up his shotgun as he backed out of the door because he was scared of the victim. *Id.* at 646-48. Appellant yelled for Dan Umble to help remove the victim from the residence, or "somebody's gonna get shot." *Id.* at 649. Appellant claimed the victim then reached for his gun so Appellant shot him out of fear for his life. *Id.* at 651. Appellant asked everyone for their phones and keys so they could not call police, he dragged the victim's body and covered it with a tarp, and he "ran screaming into the woods." *Id.* at 654-55, 669.

9

On cross-examination, Appellant admitted his occupation was that of drug dealer, and he sold drugs out of the house at 304 Creek Road. (N.T. at 675). In fact, Appellant had "three such establishments." *Id*. When asked to clarify, Appellant stated, "I mean I paid the rent and some of the utilities at two other places besides this one. This was my main place, but every once in a while I'd like to divert some of the traffic and go stay in other places." *Id*. at 676. When asked about other people coming to 304 Creek Road to buy drugs, Appellant stated, "I don't think there was ever a time that someone that didn't live there came there for any other reason." *Id*.

Appellant further stated that he and the victim were arguing about marijuana the victim had stolen from Appellant immediately before Appellant shot the victim. (N.T. at 676). Appellant intended to sell or smoke that marijuana himself. *Id*. at 676-77. Appellant denied killing the victim over a rumor that the victim was buying drugs from Appellant's mother, even though he told the police during his interview that the argument was over the victim buying drugs from his mother. *Id*. at 677. When asked to explain this contradiction, Appellant stated, "I lied a lot to the troopers." *Id*. at 678.

Appellant testified that after the shooting he took off into the woods, but he denied the prosecutor's assertion that he hid in the woods because he knew police were looking for him. (N.T. at 670-71). When confronted with a recorded conversation between he and his mother at Lancaster County Prison ("LCP") after his arrest, where Appellant told his mother he considered holding out in a foxhole but decided not to because he didn't want to go down like that, Appellant agreed he made the statement. *Id*. at 673. Appellant also ditched his cellphone in the woods, but he denied doing so to prevent police from tracking him. *Id*. at 672. When confronted with a recorded conversation between he and his mother at LCP after the arrest, where Appellant

10

said he left the cellphone in the woods so police could not track him, Appellant acknowledged he "might have said it." *Id*. at 672-673.

Trooper Roberts testified that when Appellant was taken into custody, he had $3,875 in U.S. currency. (N.T. at 516-18). Roberts also discussed the surveillance system located at the residence, which included three different cameras that recorded footage into a DVR. *Id*. at 522-533. One camera focused on the bottom basement door, a second camera focused on the corner of the residence, and a third camera overlooked the garage area. *Id*. at 523. The cameras, which were activated by motion sensor, did not capture the shooting incident itself. *Id*. at 523-31, 541. A safe recovered from the residence contained Appellant's identification, $664 in U.S. currency, owe sheets, drug paraphernalia for distribution, and methamphetamine. *Id*. at 532-39.

Trooper Tien Duong testified that he assisted in evidence collection. (N.T. at 446). While processing the crime scene, Duong removed a gun from the front of the residence. *Id*. at 448. A second gun, which was holstered with a snap across the back of the gun, was located just outside the doorway of the basement entrance to the residence. *Id*. at 449-52.

Dr. Wayne K. Ross, Lancaster County Forensic Pathologist, testified that he conducted an autopsy on Julius Dale, III. (N.T. at 601). According to Dr. Ross, the cause of death was gunshot wound to the chest. *Id*. at 608. The manner of death was homicide. *Id*.

## DISCUSSION

**I.     The Trial Court Properly Denied Appellant's Request for a Trial Continuance so New Counsel Could Enter Their Appearance and Prepare for Trial.**

Appellant first argues that his request to have new counsel assume his defense should have been granted, and new counsel should have been afforded a continuance to prepare for trial.

11

*See* Statement.  Appellant asserts this denial of his request for a continuance was an abuse of discretion which amounted to a violation of his state and federal constitutional rights.  *Id.*

The grant or denial of a motion for a continuance is within the sound discretion of the trial court, and will not be reversed absent an abuse of discretion.  *Commonwealth v. Brooks*, 104 A.3d 466, 469 (Pa. 2014).  An accused enjoys a right to choose at his own expense any lawyer he may desire.  *Commonwealth v. Novak*, 150 A.2d 102, 109 (Pa. 1959).  However, a defendant's right to choose counsel must be exercised in a reasonable time and manner.  *Id.* at 110.  An accused's right to choose a particular lawyer is not absolute, but must be weighed against the public need for the efficient and effective administration of justice.  *Commonwealth v. Kittrell*, 427 A.2d 1380, 1381 (Pa. Super. 1981); *see also Commonwealth v. Brown*, 145 A.3d 196, 204 n.16 (Pa. Super. 2016), *appeal granted*, 165 A.3d 868 (Pa. 2017).

In the present case, Appellant was arrested and charged with one count of criminal homicide on May 28, 2016.  (Notes of Testimony, Pretrial Hearing, 7/20/17 at 3) (hereinafter "N.T.P.H.").  On July 28, 2016, Randall L. Miller, Esquire, entered his appearance as court-appointed counsel for Appellant.  *Id.*; *see also* Entry of Appearance.  Thereafter, Mr. Miller continued to represent Appellant at all subsequent court proceedings.  (N.T.P.H., 7/20/17 at 3).  On January 6, 2017, following a pretrial hearing, the trial court entered an order scheduling trial to begin on May 22, 2017.  *See* 1/6/17 Order.  However, on April 27, 2017, less than one month before trial was to begin, Mr. Miller advised the court that he would not be able to proceed to trial on May 22, 2017, due to a medical condition.  (N.T.P.H., 7/20/17 at 3-4).  Counsel asked for an indefinite continuance because he did not know when his medical issues would be resolved.  *Id.* at 4.

12

Because the court was concerned about Appellant's right to a speedy trial and prejudice to the Commonwealth, the court appointed Edwin G. Pfursich, Esquire, as new counsel on April 27, 2017. (N.T.P.H., 7/20/17 at 4). Mr. Pfursich was initially of the belief that he could be prepared to proceed to trial on May 22, 2017. *Id.* However, on May 15, 2017, only seven days before the start of trial, Mr. Pfursich submitted an uncontested motion to continue trial for sixty days because he determined he could not be prepared for trial. *Id.* at 4-5; *see also* Defendant's Uncontested Motion to Continue Trial. The motion was granted and trial was rescheduled for July 31, 2017. (N.T.P.H., 7/20/17 at 5; *see also* 5/17/17 Rescheduling Order).

On July 12, 2017, Appellant and Mr. Pfursich appeared in court for a pretrial evidentiary hearing. At the conclusion of the hearing, the court asked whether there were any additional matters to address, and there was no response from Appellant. (Notes of Testimony, Evidentiary Hearing 7/12/17 at 66) (hereinafter "N.T.E.H."). The court asked whether counsel would be prepared to proceed to trial on July 31, 2017, and Appellant's counsel stated he was. *Id.* At no time during this hearing, which was held only 19 days before the start of trial, did Appellant inform the court of dissatisfaction with appointed counsel or a desire to retain private counsel.[4]

On July 19, 2017, only nine business days before the start of trial, appointed counsel appeared in chambers to announce that Michael V. Marinaro, Esquire, had entered his appearance as private counsel for Appellant. (N.T.P.H., 7/20/17 at 2). This entry of appearance was filed by Mr. Marinaro while Mr. Pfursich was still appointed counsel for Appellant, and

---

[4] When Appellant was asked at the hearing on July 20, 2017 why he did not speak up, Appellant claimed he was afraid of being held in contempt to court. (N.T.P.H., 7/20/17 at 16-18). However, there was absolutely nothing in the record to indicate that the trial court ever threatened Appellant in any manner or treated him with anything other than the professional courtesy he was to be afforded.

13

despite the fact that appointed counsel had never filed a motion to withdraw. *Id.* at 2-3.[5] Thus, a hearing was scheduled for the following day. Prior to the scheduled hearing on July 20, 2017, Mr. Pfursich provided chambers with a motion to withdraw as counsel, which was based on the entry of appearance filed by Mr. Marinaro. *See* Motion to Withdraw.

At the hearing held on July 20, 2017, the court was prepared to grant Mr. Pfursich's motion to withdraw as counsel and permit Mr. Marinaro to represent Appellant at trial if Mr. Marinaro was prepared to proceed to trial on the scheduled date of July 31, 2017. (N.T.P.H., 7/20/17 at 10-11; *see also* Order, 7/21/17). Thus, Appellant was entitled to counsel of his choice. However, Mr. Marinaro stated he would not be prepared to proceed to trial on July 31, 2017. (N.T.P.H., 7/20/17 at 10). In order to properly prepare the case, Mr. Marinaro stated he would need a trial continuance of at least two to three months. *Id.* at 10-11.

The trial court then expressed concern about a continuance, noting the case was now fourteen months old, Appellant has been represented by appointed counsel continuously for approximately one year, Appellant had more than one year to retain private counsel but failed to do so, all pretrial matters had been resolved, at no time did Appellant express concern with appointed counsel or a desire to retain private counsel when he was in court during any prior court proceedings, the case was already continued one time on the defense, the prosecutor had already issued subpoenas and was meeting with witnesses, and trial was scheduled to begin in only eight business days. (N.T.P.H., 7/20/17 at 3-6). Furthermore, Mr. Pfursich acknowledged

---

[5] Counsel for a defendant may not withdraw his appearance except by leave of court. Pa.R.Crim.P. 120. When granting leave, the court should determine whether new counsel will be stepping in, and if so whether the change in attorneys will not delay the proceedings or prejudice the defendant, particularly concerning time limits. Pa.R.Crim.P. 120 (Comment).

14

he had been diligently preparing the case since April 2017, and he was prepared to proceed to trial as Appellant's counsel on July 31, 2017. *Id.* at 7. Moreover, if Appellant's continuance request was granted, the court would not be available until October at the earliest, which would be at least 17 months after the shooting death. *Id.* at 5.

When the court asked why the continuance request should be granted, Mr. Marinaro cited Appellant's right to the counsel of his choice. (N.T.P.H., 7/20/17 at 24). Appellant stated that while he was extremely pleased with prior appointed counsel, he was dissatisfied with Mr. Pfursich. *Id.* at 16-19. Mr. Pfursich stated that because Appellant was satisfied with prior appointed counsel, he really only had three months to consider hiring private counsel rather than fourteen months because had no reason to hire private counsel until May 2017. *Id.* at 14-15.

When pressed for details about his concerns with Mr. Pfursich, Appellant stated that he had not yet been able to hear the contents of a telephone call which the prosecutor sent by email to counsel just one week ago, because counsel could not get it to play on his computer. (N.T.P.H., 7/20/17 at 19-21). In response, counsel indicated he was working with the prosecutor to correct the problem. *Id.* Another concern expressed by Appellant was the inability of Mr. Pfursich to play on the computer a complete statement Appellant had given to the police. *Id.* at 21. However, Appellant acknowledged that prior counsel was unable to do so as well. *Id.* Appellant also referenced not hearing one witness statement. *Id.* at 20. However, counsel noted he intended to visit Appellant in the days leading up to trial for final preparations. *Id.* at 20-21. Finally, Appellant expressed concern about the experience and enthusiasm of Mr. Pfursich in defending his case compared to prior counsel. *Id.* at 23, 32-33. However, from discussion it was obvious Appellant was basing this concern solely on the contrasting styles of the attorneys. *Id.*

15

When asked about Appellant's stated concerns, Mr. Pfursich said he had met with Appellant on five or six occasions, they reviewed discovery, and the relationship has been cordial. (N.T.P.H., 7/20/17 at 9-13). Originally, Appellant and counsel interacted well and Appellant was very interested in preparing for his case. *Id.* at 8. However, the relationship seemed to change when counsel presented a plea offer from the Commonwealth, along with a recommendation that Appellant consider the offer. *Id.* at 29, 31, 40-41. Appellant was not happy with the advice and rejected the offer. *Id.* at 29, 40-41.[6] Appellant also expressed dissatisfaction with counsel's opinion and his advice as to the strengths, weaknesses and strategy of the case. *Id.* at 9. However, counsel did not believe this was uncommon. *Id.*

Regarding experience, Mr. Pfursich noted he has been a practicing attorney for 12 years. (N.T.P.H., 7/20/17 at 33). He spent six years as a prosecutor and six years as a criminal defense attorney, handling between 30-40 jury trials. *Id.* at 33-34. Despite Appellant's representations to the court, Mr. Pfursich stated he did not believe he had any irreconcilable differences with Appellant, he believed he could properly represent Appellant at trial, he has diligently prepared the case, and he was ready to proceed to trial on July 31, 2017. *Id.* at 6-7, 10, 31. He only filed the motion to withdraw as counsel because that was his common practice once another attorney enters their appearance. *Id.* at 6-7.

On July 21, 2017, after conducting a proper balancing test, the court entered an opinion and order concluding that Appellant's right to counsel of his choice was not exercised in a reasonable time and manner when weighed against the public need for the efficient and effective

---

[6] Prior appointed counsel, for whom Appellant stated he was extremely pleased, also attended that meeting and agreed with the advice of Mr. Pfursich. (N.T.P.H., 7/20/17 at 29-31, 40).

16

administration of justice. *See* Opinion and Order, 7/21/17. Consequently, counsel's motion to withdraw was denied, because granting the motion would have required a trial continuance. *Id.*

In *Commonwealth v. Harding*, 369 A.2d 429 (Pa. Super. 1976), the trial court's denial of a defendant's motion for continuance so he could obtain private counsel to replace appointed counsel did not constitute an abuse of discretion or violate the defendant's Sixth Amendment rights where the defendant was not tried until 11 months after his arrest and the motion was not made until a few days before his trial. *Id.* at 430. In *Commonwealth v. Randolph*, 873 A.2d 1277 (Pa. 2005), the trial court acted within its discretion in a capital-murder trial in denying a defendant's request for a continuance to enable private counsel to represent him since the case had already been continued twice on the defendant and the defendant waited until two business days before trial was scheduled to begin to apprise the trial court of his desire for private counsel. *Id.* at 1282. In *Commonwealth v. Basemore*, 582 A.2d 861 (Pa. 1990), the Supreme Court held that the defendant waived his right to counsel of his choice by failing to take any steps to retain private counsel and in belatedly requesting a continuance and appointment of new counsel without setting forth a substantial reason. *Id.* at 866.

More recently, the Pennsylvania Supreme Court held that the trial court did not abuse its discretion in denying a continuance request by a defendant on the day of jury selection so the defendant could proceed *pro se*. *Brooks*, 104 A.3d at 467. The Court noted that nothing in the record showed the defendant had "irreconcilable differences" with his appointed counsel or received less than competent representation. *Id.* at 477. Rather, the defendant claimed his counsel had not met with him to discuss the case to his satisfaction. *Id.* The trial court inquired into that very point, and the record showed that counsel discussed the case with the defendant,

17

counsel was well-prepared, and there was no indication any alleged ongoing differences between the defendant and appointed counsel would effect the trial. *Id.* Furthermore, the initial trial date was continued for four weeks and the case was at least one year old. *Id.* at 472.

As stated in *Brooks*, the trial court may manage its own trial schedule, and "the silence of the Commonwealth, or even the agreement of the Commonwealth, does not control a judge's exercise of discretion in such matters; and, in this case, the lawyers for both sides were ready to proceed to trial on this already continued trial date." 104 A.3d at 477. As the Court noted:

> [T]his appeal is not simply about the right to self-representation; it also involves the timing of such requests, and the trial court's authority to manage its docket and trial schedule . . . Obviously, defendants should not be permitted to unreasonably clog the machinery of justice or hamper and delay the effort to administer justice effectively.

*Id.* at 474-75 (internal quotations and citations omitted).

In his Statement, Appellant alleges "the Commonwealth did not object to the continuance and was not substantially prejudiced by the delay." *See* Statement. However, the Commonwealth *did* object to the court granting the motion to withdraw by Mr. Pfursich if that meant continuing the case:

| | |
|---|---|
| THE COURT: | All right. What is the Commonwealth's official position with regard to the request, first of all, the motion to withdraw by Mr. Pfursich, and then, if Mr. Marinaro is then counsel, the request for a continuance? |
| PROSECUTOR: | My position with respect to if Mr. Marinaro is granted permission to enter, I certainly would not be opposed to a continuance. I think it would be necessary for him to have a continuance. I hope, for how eager the family is to have this case resolved, I don't think there's any appetite for having it tried a second time if it comes down to that. As far as the withdrawal of Mr. Pfursich, he has been in this case for approximately two-and-a-half months. As I said, I am ready to proceed. I know Mr. Pfursich to be an excellent defense |

18

attorney, and so *I would be opposed to a request for - - if it's going to result in the continuance of this case to have Mr. Pfursich leave the case, then I would be opposed to Mr. Pfursich leaving the case.*

(N.T.P.H., 7/20/17 at 37-38) (emphasis added). Clearly, the Commonwealth did object to a continuance by opposing Mr. Pfursich's motion to withdraw. *Id.* However, if Mr. Marinaro was permitted to enter his appearance, a continuance would be necessary to avoid a retrial. *Id.*

Appellant is correct that the Commonwealth stated they did not believe they would be substantially prejudiced if the case was continued. (N.T.P.H., 7/20/17 at 36-37). However, the prosecutor did indicate that all witnesses had been subpoenaed for trial, the prosecutor had been meeting with the witnesses in preparation for trial, some witnesses did not have steady addresses or phone numbers, while he knew where those witnesses were at the present time there was no guarantee they could be located in the event the case was continued to a later date, and the prosecutor had no way of knowing whether his witnesses would be available for trial in October. *Id.* at 6, 34-37. Furthermore, the Commonwealth noted the case was over one year old, they were ready to proceed to trial, and family members of the victim were anxious to have this case resolved. *Id.* at 34-35. These concerns were noted by the court, and "the silence of the Commonwealth, or even the agreement of the Commonwealth, does not control a judge's exercise of discretion in such matters . . . ". *Brooks*, 104 A.3d at 477.

Appellant's trial date was scheduled for July 31, 2017, fourteen months after his arrest for homicide, and a three-month continuance would have scheduled the trial for seventeen months after the shooting. In *Harding, supra*, the trial court's denial of the defendant's continuance motion so he could obtain private counsel to replace appointed counsel did not constitute an

19

abuse of discretion where the defendant was tried eleven months after his arrest and the motion was not made until a few days before his trial. A delay of seventeen months in this case would be unreasonable under the circumstances, particularly where family members of the victim were seeking closure and the case had already been continued one time by the defense for a period of two months.

Furthermore, Appellant had more than one year to retain private counsel, yet he failed to do so until eight business days before the start of the rescheduled trial. Even if a desire for private counsel did not occur until May 2017, Appellant still had plenty of time before July 19, 2017 to hire private counsel or notify the court of his intent to do so. Appellant failed to do so, even when he appeared before the court on July 12, 2017 for an evidentiary hearing.

The Commonwealth for the second time had subpoenaed witnesses, prepared the case for trial to start on July 31, 2017, and indicated that any continuance could potentially result in an inability to keep track of witnesses. The Commonwealth also did not know whether their witnesses would be available for trial in October, so there was the potential for further dely.

There were no irreconcilable differences between Appellant and Mr. Pfursich. As in *Basemore*, *supra*, Appellant failed to set forth a substantial reason why counsel should no longer represent him. Moreover, as in *Brooks*, the attorneys for both sides were ready to proceed to trial on July 31, 2017, without the need for further delay. Further, there was no indication that any conflict existed between Appellant and Mr. Pfursich during the course of the trial, and nothing in the record to show that Appellant received anything less than competent representation.[7]

---

[7] Immediately prior to the start of trial, the court confirmed with Mr. Pfursich that Appellant had been cooperative with counsel since the hearing held on July 20, 2017, and Mr. Pfursich did not anticipate any problems with Appellant during the course of the trial. (N.T. at 21).

20

Finally, the first request for a defense continuance occurred on May 15, 2017, only seven days before the scheduled start of trial, making it difficult for the court to schedule other hearings during a week reserved for trial. A second defense continuance on such short notice would have resulted in similar court inefficiencies. As stated in *Brooks*, *supra*, a defendant's request for a continuance so he can obtain private counsel involves not only the right to counsel of one's choice, but also the timing of such a request and the trial court's authority to manage its docket and trial schedule. Defendants should not be permitted to unreasonably clog the machinery of justice or hamper and delay the effort to administer justice effectively.

For all of these reasons, the trial court properly denied Appellant's request for a trial continuance.[8]

## II.    The Trial Court Did Not Err When it Allowed the Commonwealth to Introduce Appellant's Intercepted Prison Visit Conversations.

Appellant asserts the trial court erred by allowing the Commonwealth to introduce his intercepted prison visit conversations, because they were intercepted in the absence of explicit consent by both parties or by judicial authorization in violation of the Wiretap Act, 18 Pa.C.S.A. § 5701, et seq., and *Commonwealth v. Fant*, 146 A.3d 1254 (Pa. 2016). *See* Statement.

---

[8] Appellant cited *Commonwealth v. Prysock*, 972 A.2d 539 (Pa. Super. 2009) at the hearing in support of his motion. In *Prysock*, the Superior Court found the trial court abused its discretion when it denied the appellant's request for a continuance of his trial, which was scheduled to be held less than six months after he was charged with the offense, so he might proceed to trial with retained counsel of his choice. *Id.* at 545. However, *Prysock* is distinguishable from the instant case. In *Prysock*, the case was scheduled for trial less than six months after the appellant was charged, appointed counsel represented the appellant for less than 30 days prior to the start of trial, the Commonwealth did not object to a continuance, the court did not conduct an extensive inquiry into the nature of the dispute between the appellant and appointed counsel, the court relied on the single factor of one prior continuance to deny the request, the court failed to engage in any balancing of the appellant's right to retain counsel of his choice versus the Commonwealth's right to the swift administration of justice, and the court failed to explain how the swift administration of justice would be thwarted by granting the continuance. *Id.* at 544-45. The holding in *Prysock* was also questioned by the Supreme Court in *Brooks*, *supra*. 104 A.3d at 477.

21

On January 31, 2017, the Commonwealth filed a Notice seeking to introduce evidence of Appellant's pretrial incarceration in LCP, to place in proper context recorded telephone calls involving Appellant while he was incarcerated awaiting trial on the present charge of homicide. *See* Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Rule of Evidence 404. On that same day, Appellant filed a motion in limine seeking to preclude as irrelevant or overly prejudicial the contents of those telephone calls. *See* Motion in Limine.

On April 17, 2017, a pretrial hearing was held on these motions, at which time the court *sua sponte* questioned whether the recorded conversations would be inadmissible in light of *Commonwealth v. Fant*, 146 A.3d 1254 (Pa. 2016), which precluded the admission of conversations recorded in prison. (N.T.P.H., 4/17/17 at 16-21).[9] The Commonwealth replied that Appellant never filed a motion to suppress pursuant to *Fant*. *Id.* at 16. Nevertheless, *Fant* was not applicable to the present case, and an evidentiary hearing would show that Appellant and his guests had no expectation of privacy in the recorded conversations. *Id.* at 17.

On May 5, 2017, prior to an evidentiary hearing on this matter, Appellant filed a motion in limine seeking to preclude the admissibility of conversations involving Appellant and his visitors which were recorded at LCP, alleging they were recorded in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act. *See* Motion in Limine to Preclude Visit Conversations Inside Lancaster County Prison as a Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. Section 5701 et al.

---

[9] In *Fant*, the defendant moved to suppress recordings of conversations he had with visitors in prison using a telephone-like handset apparatus, because the recordings did not involve the dialing of a telephone number or use of a telephone company outside the facility. 146 A.3d at 1255-56. The Supreme Court agreed and held that visit conversations in prison do not constitute telephone calls subject to the exception set forth in Section 5704(14) of the Wiretap Act. *Id.* at 1263-65.

22

At the hearing held on May 5, 2017, Robert Barley testified that he works as the inmate disciplinary coordinator and investigative assistant at LCP. (N.T.P.H., 5/5/17 at 4). Barley stated there is a non-contact area of the prison that contains ten separate handsets which are used to facilitate communication between inmates and visitors, who face each other on separate sides of a glass partition. *Id.* at 4-5, 12. Barley presented photographs of the non-contact area. *Id.* at 5; (Com. Exh. #1-7). The handsets are about three to four feet apart, and there is a small glass pane between each handset presumably to give the inmates and visitors "a little bit of privacy." (N.T.P.H, 5/5/17 at 13-14). There is nothing else to separate the guests from each other or the inmates from each other in an otherwise large open area. *See* Com. Exh. #1.

When the handsets are used, the conversations are recorded. (N.T.P.H., 5/5/17 at 5). Above each handset, plainly visible to the inmate and visitor on their side of the glass partition, is a sign that reads in capital letters "THIS CALL MAY BE INTERCEPTED, RECORDED, MONITORED, OR DIVULGED AT ANY TIME." *Id.* at 5-8, 10; (Com. Exh. #1-3, 5-7).

Before the start of each conversation, a recording also advises the inmate and their visitor that their conversations are "subject to recording and monitoring." (N.T.P.H., 5/5/17 at 8-10; Com. Exh. #8). These signs and the audio warning advising that the conversations may be monitored and/or recorded were in place prior to Appellant's incarceration in May 2016, such that he and his visitors were clearly on notice prior to each conversation that what they said could be subject to interception, recording, monitoring, and subsequent divulgence. (N.T.P.H., 5/5/17 at 10). On cross-examination, Barley testified that he did not know whether inmates are required to provide any written or verbal consent to the recording, and he was not aware of any procedures to ensure the inmates understand what the sign says or the recording means. *Id.* at 11.

23

On May 12, 2017, following the evidentiary hearing, the court entered an opinion and order denying Appellant's motion in limine, finding that Appellant and his visitors gave prior consent to the interception of their conversations by voluntarily engaging in conversation after knowing in advance that their conversations could be intercepted, monitored, recorded, and divulged. *See* Opinion and Order, 5/12/17. Because Appellant and his visitors did not have any reasonable expectation of privacy in their conversations, the recorded conversations fell within the mutual consent exception of the Wiretap Act (18 Pa.C.S.A. Section 5704(4)). *Id.* Appellant reserved the right to object to admissibility at trial based on relevance. *Id.*

Under the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), it is unlawful if one "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication[,]" except as otherwise provided in the Act. 18 Pa.C.S.A. § 5703(1). The Wiretap Act is intended to protect individual privacy. *Commonwealth v. Parrella*, 610 A.2d 1006, 1009 (Pa. Super. 1992). Thus, any exception to the broad prohibition against interception, disclosure, or use of electronic, wire, or oral communications must be very narrowly drawn. *United Tel. Co. of Pa. v. Pa. P.U.C.*, 676 A.2d 1244, 1252 (Pa. Cmwlth. 1996). Unless the interception was made pursuant to an exception in Section 5704 of the Act, or by prior court order, an aggrieved party to any proceeding may move to exclude the contents of the wire, electronic or oral communication, or evidence derived therefrom. 18 Pa.C.S.A. § 5721.1(b).

One exception set forth in Section 5704 of the Wiretap Act permits a county correctional facility to intercept, record, monitor or divulge the contents of any "telephone calls" from or to an inmate under certain conditions. 18 Pa.C.S.A. § 5704(14). However, in *Fant, supra*, the

24

Supreme Court held that visit conversations in prison do not constitute telephone calls subject to the specific exception set forth in Section 5704(14) of the Wiretap Act. 146 A.3d at 1263-65. Thus, because the handsets in the present case were similar to those used in *Fant*, the trial court determined that the Commonwealth would not be permitted to introduce Appellant's recorded visit conversations as an exception pursuant to Section 5704(14) of the Wiretap Act.

Nevertheless, recorded conversations may be admissible under Section 5704(4) of the Wiretap Act when all parties to the conversation consent to the interception:

> It shall not be unlawful and no prior court approval shall be required under this chapter for [a] person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.

18 Pa.C.S.A. § 5704(4). "[I]n the case of a private individual, it is the law of Pennsylvania under 18 Pa.C.S.A. § 5704(4) that *all* parties to the communication must consent to the interception." *Commonwealth v. Jung*, 531 A.2d 498, 503 (Pa. Super. 1987) (emphasis in original).

In *Commonwealth v. Rozanski*, 433 A.2d 1382 (Pa. Super. 1981), where the appellant argued it was error for the lower court to admit into evidence a tape recorded message he left for the rector of a church because its admission violated the Wiretap Act, the Superior Court cited 18 Pa.C.S.A. Section 5704(4) in rejecting this argument by stating it was not unlawful to intercept a wire or oral communication where all parties to the communication gave prior consent to the interception. *Id.* at 1385-86. In *Commonwealth v. De Marco*, 578 A.2d 942 (Pa. Super. 1990), the Superior Court held that messages left on answering machines fall within the mutual consent exception of the Wiretap Act and are not unlawful interceptions. *Id.* at 948. As the court noted:

> [W]e take judicial notice of the irrefutable fact that any reasonably intelligent person leaving a message on an ordinary answering machine would have to be aware of, and *consented by conduct* to, the recording of the message on the answering machine

25

tape. Absent some special showing of unique attributes of a particular answering machine cloaking its identity as an answering machine (not suggested here), we cannot imagine how one could not know and intend that the message placed upon the answering machine tape *be taped*, and *by the very act of leaving a message, expressly consent by conduct to the taping of that message*. Thus, we find, as a matter of law, that ordinary answering machine tapes fall within the mutual consent provision of the [Wiretap Act], 18 Pa.C.S.A. § 5704(4), are *not* unlawful interceptions, and are not subject to the *statutory* exclusionary rule, 18 Pa.C.S.A. § 5721.

*Id.* (emphasis in original).

In *Fant*, *supra*, the Supreme Court implicitly approved of 18 Pa.C.S.A. § 5704(4) as an exception to the Wiretap Act when it stated "[a]bsent a showing that Fant lacked a reasonable expectation of privacy in these visit conversations, suppression is still appropriate to remedy a constitutional violation, if not a statutory one." 146 A.3d at 1265 n.13. However, the Court was bound by the suppression court's conclusion that the defendant had an expectation of privacy, after the trial court found the defendant was alone in a room with a visitor and there was no evidence he was warned the conversation was not private or could be intercepted. *Id.* at 1263-65.

Because Appellant and his visitors gave prior consent to the interception of their communications by voluntarily engaging in conversations after knowing the conversations could be intercepted, monitored, recorded, and divulged, Appellant and his visitors no longer had any reasonable expectation of privacy in their conversations. As such, these recorded conversations fell within the mutual consent exception of the Wiretap Act, 18 Pa.C.S.A. § 5704(4), and they were not subject to the statutory exclusionary rule of 18 Pa.C.S.A. § 5721.1(b).

Nevertheless, Appellant argued in his memorandum in support of his motion in limine that section 5704(4) is inapplicable because there is no evidence that he or his guests gave explicit prior written or verbal consent to the interception, and there is no evidence to show that

Appellant or his guests read the signs posted in the non-contact room or understood the audio warnings. *See* Memorandum. However, in *Commonwealth v. Proetto*, 771 A.2d 823 (Pa. Super. 2001), the Superior Court found that a defendant expressly consented to the recording of emails and chatroom messages he sent over the internet by the very act of sending a communication over the internet, even though the defendant never explicitly consented to the interception or recording. *Id.* at 829. This express consent was extended to text messages in *Commonwealth v. Diego*, 119 A.3d 370, 376-77 (Pa. Super. 2015).

As in *De Marco*, *Proetto*, and *Diego*, this court took judicial notice of the irrefutable fact that any reasonably intelligent person choosing to speak with another through the handsets in question would have to be aware of and intend that their conversations be recorded and subsequently divulged. Unlike *Fant*, who was alone in a room and was not warned that his conversation could be intercepted, Appellant and his visitors were in large rooms that contained nine other handsets in close proximity to one another.[10] Appellant and his guests were also warned prior to their conversations, by visual signs in capital letters and audio message, that anything they said could be intercepted, recorded, monitored or divulged. Appellant and his visitors consented by their conduct to the interception, recording, monitoring and divulgence of their conversations when they chose to engage in conversation after being put on notice.

---

[10] In *Agnew v. Dupler*, 717 A.2d 519, 524 (Pa. 1998), the Supreme Court held that a police officer's conversation with two other officers in the squadroom were not oral communications within the meaning of the Wiretap Act because the squadroom door was open, all conversations could be heard without amplification in the police chief's office, the intercom lines on the squadroom telephones could have been open at any time, and therefore the officer did not possess a reasonable expectation of privacy in the conversation. *Id.* at 524. Likewise, in the present case, the inmate and visitor rooms are wide open, the inmates sit only 3-4 feet apart while conversing with their guests, and photographs illustrate the very real probability that Appellant's conversations could be heard by others without amplification.

27

Appellant further claimed in his memorandum that any implied consent was involuntary because he was faced with the choice of consenting to the interception or losing his right to visitation. *See* Memorandum. However, in *Commonwealth v. Clark*, 533 A.2d 1376 (Pa. 1987), where the Supreme Court addressed voluntary consent under the Wiretap Act when an informant gave prior consent to an interception but testified he did so only because he did not want to face criminal prosecution, the Court found it would be inappropriate to conclude that the informant's consent was involuntary based on an unfounded inference that the threat of prosecution overwhelmed his free will. *Id.* at 1379-80. The Court stated:

> To determine that [informant's] consent was coerced merely because his alternative was unpleasant is to conclude that one cannot choose the lesser of two evils. Such a suggestion belies reality. Because we find that the consent given by [informant] was not compromised and was, therefore, voluntary, we must reject the Superior Court's Order affirming the suppression of the telephonic disclosures made by [appellee] to [informant].

*Id.* at 1382.

Correctional facilities have a rational and legitimate reason for intercepting, recording, monitoring, and divulging inmate telephone calls, to protect the public from criminal activity on the part of inmates. *Chimenti v. Pa. Dep't of Corr.*, 720 A.2d 205, 214 (Pa. Cmwlth. 1998). Inmates and visitors have a choice to either accept these restrictions or decline to use the headsets. Consent is not coerced merely because the alternative is unpleasant. *See Clark.* In this case, Appellant was not subject to duress, coercion, or an overborne will when he decided to converse by headset knowing his conversations were recorded. It would be pure sophistry to dismiss Appellant's voluntary consent on an unfounded inference of involuntary consent.[11]

---

[11] Custody alone has never been enough to demonstrate a coerced confession or involuntary consent to search. *Commonwealth v. Paredes-Rosaria*, 700 A.2d 1296, 1299 (Pa. Super. 1997).

28

When reviewing a trial court's decision to grant or deny a motion in limine, the appellate courts apply an evidentiary abuse of discretion standard. *Commonwealth v. Schley*, 136 A.3d 511, 514 (Pa. Super. 2016). For the reasons stated herein, the trial court did not err when it allowed the Commonwealth to introduce Appellant's intercepted prison visit conversations.[12]

Assuming, *arguendo*, the recorded conversations were inadmissible, an erroneous ruling on an evidentiary issue does not automatically entitle a defendant to relief where the error was harmless. *Commonwealth v. Yockey*, 158 A.3d 1246, 1254 (Pa. Super. 2017). Not all errors at trial entitle an appellant to a new trial, and the harmless error doctrine reflects the reality that an accused is entitled to a fair trial, but not a perfect trial. *Commonwealth v. Green*, 162 A.3d 509, 519 (Pa. Super. 2017). An error may be harmless if the properly admitted evidence of guilt was so overwhelming and the prejudicial effect so insignificant by comparison that it is clear beyond a reasonable doubt the error could not have contributed to the verdict. *Commonwealth v. Stetler*, 95 A.3d 864, 890 (Pa. Super. 2014).

At trial, the Commonwealth introduced redacted conversations between Appellant and his mother which occurred at LCP on June 12, 2016 and September 18, 2016, following his arrest on this charge. (N.T. at 583-96; Com. Ex. #57). The Commonwealth played four brief excerpts, which essentially corroborated Appellant's drug dealing activities and rebutted the statement he

---

[12] On May 12, 2017, the court entered an order allowing the Commonwealth to introduce evidence of Appellant's pretrial incarceration, because it would be difficult to explain the context in which the intercepted communications occurred without showing where he was located. *See* Order and Opinion, 5/12/17. Further, Appellant's incarceration would have very little prejudicial effect because it would not be unreasonable for the jury to assume he was incarcerated on this charge pending trial, and the court would provide a cautionary instruction. *Id*. In *Commonwealth v. Kinard*, 95 A.3d 279 (Pa. Super. 2014), the Superior Court held that the jury was properly informed the defendant was in prison when phone calls were recorded as long as a cautionary instruction was given. *Id*. at 287.

29

gave to police that he acted in self-defense. *Id.* Thereafter, the prosecutor briefly referenced those recorded conversations while cross-examining Appellant in order to challenge his testimony regarding flight after the shooting occurred. (N.T. at 672-73).

The evidence of guilt in this case was overwhelming, as several eyewitnesses testified that Appellant shot the victim without provocation. Because the properly admitted evidence of guilt was so overwhelming and the prejudicial effect so insignificant by comparison, it is clear beyond a reasonable doubt that any error could not have contributed to the verdict.

### III. The Trial Court Properly Denied the Motion to Suppress Appellant's Custodial Interrogation.

Appellant next argues his Motion to Suppress Defendant's Statements should have been granted and his custodial interrogation should have been suppressed because state police troopers failed to inform him of the nature of the investigation prior to advising Appellant of his *Miranda* rights. *See* Statement. Because Appellant was not informed of the nature of the investigation prior to the interrogation, he claims his waiver was not knowing and intelligent, and the trial court should have suppressed the subsequent statements. *Id.*

When a motion to suppress is filed, the Commonwealth has the burden of establishing by a preponderance of the evidence that the challenged evidence is admissible. *Commonwealth v. Bowmaster*, 101 A.3d 789, 792 (Pa. Super. 2014). When the Commonwealth prevails before the trial court, an appellate court "may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Jackson*, 62 A.3d 433, 438 (Pa. Super. 2012) (quoting *Commonwealth v. Boczkowski*, 846 A.2d 75, 89 (Pa. 2004).

30

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007) (quoting *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003)). Furthermore, "[w]here the record supports the factual findings of the trial court, [the appellate court is] bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Boczkowski*, 846 A.2d at 89.

At the suppression hearing held on January 4, 2017, Trooper Michael Snyder testified that at 8:30 a.m. on May 28, 2016, approximately one hour after Appellant was taken into custody on the charge of criminal homicide and less than one day after the homicide occurred, he and Trooper Roberts interviewed Appellant in the interview room at the PSP Lancaster barracks. (Notes of Testimony, Suppression Hearing at 106-07) (hereinafter "N.T.S.H."). Before beginning the interview, Snyder read Appellant his *Miranda* rights with the aid of a PSP Rights Warning and Waiver *Miranda* form. *Id.* at 107; (Com. S.H. Exh. #11). Appellant signed the form, waived his right to counsel, and agreed to answer questions. (N.T.S.H. at 109; Com. S.H. Exh. #11). According to Snyder, Appellant was alert, coherent, and not intoxicated. (N.T.S.H. at 109, 126). Snyder believed Appellant knew what was happening and he was making a free and voluntary decision to speak with police. *Id.* at 110.[13]

Snyder acknowledged that Appellant was not informed of the subject matter of the interrogation prior to the waiver of his *Miranda* rights. (N.T.S.H. at 126-27). However, immediately following the waiver of his *Miranda* rights and before the interview began, Snyder

---

[13] During the interview, at 10:02 a.m., Appellant asked if there was any way for him to contact an attorney. (N.T.S.H. at 142; Com. S.H. Exh. #13, 14, 16). The Commonwealth stipulated that they would not introduce any portion of the statement taken after 10:02 a.m. (N.T.S.H. at 143-44).

31

told Appellant "[b]asically we want to get to the bottom of what happened last night. So, we understand there was an altercation yesterday, an argument. And we're just, wanting to get to the bottom of it." (N.T.S.H. at 112); *see also* Transcript. Appellant replied, "Ok." *Id.*

A police officer must administer *Miranda* warnings prior to custodial interrogation. *Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. 2011) (citing *Commonwealth v. Johnson*, 541 A.2d 332, 336 (Pa. Super. 1988)). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In determining whether an individual is in custody for purposes of *Miranda*, the "ultimate inquiry is . . . whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Commonwealth v. Cooley*, 118 A.3d 370, 376 (Pa. 2015) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). Presently, Appellant was questioned by police officers after being taken into custody.

Once a suspect is subjected to custodial interrogation, any statements made are admissible if the Commonwealth can prove that the suspect "knowingly and intelligently waived his privilege against self-incrimination . . . ." *Commonwealth v. Scarborough*, 421 A.2d 147, 153 (Pa. 1980). A determination of whether a suspect has made a knowing and intelligent waiver is based on the totality of the circumstances. *Commonwealth v. Barry*, 454 A.2d 985, 988 (Pa. 1982). The Commonwealth must prove by a preponderance of the evidence that the waiver was voluntary and knowing. *Commonwealth v. Kichline*, 361 A.2d 282, 290 (Pa. 1976).

The suspect must have an awareness of the general nature of the transaction giving rise to the investigation for a waiver of *Miranda* rights to be valid. *Commonwealth v. Green*, 683 A.2d

32

659, 663 (Pa. Super. 1996). The *Green* Court stated:

> [W]here a defendant has not been told of the crime under investigation prior to his or her waiver of rights under *Miranda*, and then makes a pre-trial challenge concerning the validity of his or her confession, the Commonwealth has the burden of proving by a preponderance of the evidence that the defendant knew of the occasion for the interrogation.

*Id.* (citing *Commonwealth v. Dixon*, 379 A.2d 553, 556 (Pa. 1977)). This burden can be satisfied in a number of ways, including "the establishment of circumstances attending the interrogation, such as the prior statements of the suspect . . . or the fact that interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning." *Dixon*, 379 A.2d at 556.

In *Green*, the defendant murdered a police officer in Pennsylvania and was found one week later in Florida in possession of a stolen car. 683 A.2d at 660-61, 664. The defendant was not informed he would be asked questions about the officer's disappearance, and he claimed he thought he was only being questioned about the car theft. *Id.* at 661. The Superior Court found that the defendant's *Miranda* waiver was knowing and intelligent, even though he was not informed he would be questioned about the missing officer, because the interview followed hard upon the one-week old murder and the defendant had to be aware he would be questioned about his whereabouts and activities in the days prior to his apprehension. *Id.* at 664-65.

In *Commonwealth v. Travaglia*, 467 A.2d 288 (Pa. 1983), a defendant argued that because his pre-interrogation warning form did not mention homicide, his *Miranda* waiver with respect to questions about several homicides was not intelligent and had to be suppressed. *Id.* at 294. The Supreme Court rejected the defendant's claim because the homicides occurred over the five days immediately preceding the interrogation, the interrogation followed hard upon the

33

criminal episode, and no ambiguity was present as to the direction or purpose of the questioning. *Id.* As the Supreme Court stated, to find the defendant "was unaware of the general nature of the transaction giving rise to his questioning would be tantamount to treating as fact that which is patently hypothesis and fantasy." *Id.*

In *Commonwealth v. Friedman*, 602 A.2d 371 (Pa. Super. 1992), the Superior Court concluded the defendant was aware of the possibility she would be questioned about a homicide because she was present when she shot the victim and saw first responders attempt to revive him. *Id.* at 377; *see also Commonwealth v. Fox*, 697 A.2d 995, 997 (Pa. Super. 1997) (a defendant only needs to be aware of the general nature of the incident); *Commonwealth v. Gotto*, 452 A.2d 803, 807 (Pa. Super. 1982) (questioning suspect about a car accident did not violate the suspect's rights merely because the suspect did not know the victim had died); *Commonwealth v. Weeden*, 322 A.2d 343, 346 (Pa. 1974) (a waiver was effective when the accused thought he was discussing a robbery and was not aware a killing had occurred during the course of the robbery).

In the present case, the Commonwealth proved that Appellant was aware of the general nature of the transaction giving rise to the investigation before he waived his *Miranda* rights. Appellant was apprehended in close proximity to the shooting scene, and he was interviewed by police less than one day after the shooting occurred. Like *Green*, Appellant's interview followed hard upon the one-day old murder and he had to be aware he would be questioned about his whereabouts and activities in the day prior to his apprehension. Moreover, as in *Friedman*, Appellant had to be aware he would be questioned about the homicide because he told police he was aware his friend's body was found under a tarp. *See* Transcript. There was no ambiguity about the direction and purpose of the questioning.

34

As the Supreme Court stated in *Travaglia*, to find that Appellant was unaware of the general nature of the transaction giving rise to his questioning "would be tantamount to treating as fact that which is patently hypothesis and fantasy." 467 A.2d at 294. As such, the trial court did not err when it denied Appellant's motion to suppress his custodial interrogation.

IV. **The Trial Court Did Not Err by Refusing to Charge the Jury Pursuant to Appellant's Requested Castle Doctrine Instruction.**

Appellant next argues the trial court erred by refusing to charge the jury pursuant to his request for a castle doctrine instruction, because Appellant presented evidence which buttressed his claim of self-defense and the decedent illegally entered the residence. *See* Statement.

"The trial court has broad discretion in phrasing its instructions, . . . so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Philistin*, 53 A.3d 1, 12 (Pa. 2012) (quoting *Commonwealth v. Hawkins*, 787 A.2d 292, 301 (Pa. 2001)); *see also Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (holding "the trial court has wide discretion in fashioning jury instructions"). Furthermore, "[w]hen evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial." *Philistin*, 53 A.3d at 12 (quoting *Hawkins*, 787 A.2d at 301). Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error in the giving of jury instructions. *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014).

"The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Commonwealth v. Scott*, 73 A.3d 599, 602 (Pa. Super. 2013) (quoting *Commonwealth v. Brown*, 911 A.2d 576, 583 (Pa. Super. 2006)); *see also Thomas*, 904 A.2d at

35

970. Jury instructions are to be fair and accurate, but are not required to embody points a party should more properly make in argument. *Commonwealth v. Lesko*, 15 A.3d 345, 397 (Pa. 2011).

In the present case, a charging conference was held to address Appellant's proposed standard points for charge relating to the use of deadly force in self-defense and the use of deadly force in self-defense under the castle doctrine. (N.T. at 745).[14] The Commonwealth opposed a castle doctrine instruction when the prosecutor stated as follows:

> I don't believe the castle doctrine applies. I mean, by everybody - - everybody who knew what the fight was about, including the defendant, said that the fight was about drugs, and the residents - - first of all, there's no proof of unlawful or forceful entry at all, and that's one of the essential components. Castle Doctrine is also nullified if the residence being invaded is a place being used for illegal activity and the conflict between the combatants relates to that illegal activity. And he said it was a drug house, he sold drugs there, and his argument with Skip [the victim] was either about Skip selling drugs through his mother or about Skip stealing marijuana and selling it without his permission. So I don't see any way that we could get to the Castle Doctrine.

*Id.* at 751. In response, Appellant's counsel argued that the conflict was about the victim stealing marijuana rather than the drug trade. *Id.* at 751-52. Furthermore, the victim unlawfully entered the residence after Appellant told him to leave, or the victim attempted to unlawfully and forcefully remove Appellant from the residence against his will. *Id.* at 753-55. The court declined to give the castle doctrine instruction, but did provide the instruction regarding use of deadly force in self-defense, which included language stating that Appellant would have no duty to retreat and could stand his ground unless he initiated the incident. *Id.* at 772-76.

The relevant section of the castle doctrine which the court declined to provide includes a presumption that reads as follows:

---

[14] *See* Pa. SSJI (Crim) 9.501 and 9.501A, respectively.

36

an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

> (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
> (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S.A. § 505(b)(2.1). However, this presumption does not apply if:

> (i) the person against whom the force is used has the right to be in or is a lawful resident of the dwelling, residence or vehicle, such as an owner or lessee;
> (ii) the person sought to be removed is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the protective force is used;
> (iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or
> (iv) the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

18 Pa.C.S.A. § 505(b)(2.2). "[T]he term 'criminal activity' means conduct which is a misdemeanor or felony, is not justifiable under the chapter and is related to the confrontation between an actor and the person against whom force is used." 18 Pa.C.S.A. § 505(d).

In *Commonwealth v. Childs*, 142 A.3d 823 (Pa. 2016), the question before the Supreme Court was whether the trial court correctly found that section 505(b)(2.1) should not be applied retroactively. *Id.* at 826.[15] Because the prosecution commenced after the enactment of section

---

[15] In *Childs*, the defendant claimed self-defense and requested a castle doctrine jury instruction. 142 A.3d at 825-26. The Commonwealth agreed the facts of the case entitled the defendant to a castle doctrine defense, but objected to retroactive application because section 505(b)(2.1) did not become effective until more than a year after the defendant stabbed the victim. *Id.* at 826.

37

505(b)(2.1), the Court concluded the defendant was entitled to a jury instruction in conformance with section 505(b)(2.1). *Id.* at 835. Additionally, the Supreme Court noted that section 505(b)(2.1) creates a presumption which impacts the evidentiary burden of a defendant seeking its protection and the factfinder's analysis of the evidence to determine whether the defendant has established a castle doctrine defense. *Id.* at 833. However, as an evidentiary mechanism, the presumption has no effect unless or until it is implicated in the course of the trial. *Id.* at 832.[16]

As noted, the castle doctrine presumption does not apply to an individual who is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity. 18 Pa.C.S.A. § 505(b)(2.2)(iii). In the present case, the court found the presumption did not apply because Appellant himself admitted he was engaged in a criminal activity or was using the dwelling to further his criminal activity of selling drugs. Appellant stated he had been selling marijuana and methamphetamine for one year because he had no other source of income, selling drugs was a long-term productive way to make a living, and he allowed the victim to live at 304 Creek Road while giving the victim drugs so the victim could resell for profit. Appellant further admitted his occupation was that of drug dealer, he sold drugs out of 304 Creek Road, he had three such establishments where he paid rent and sold drugs, this was his main location for drug sales, and the only reason people came to 304 Creek Road was to buy drugs.

Moreover, the confrontation between Appellant and the victim was related to that criminal activity. Whether it was directly related to Appellant's involvement with the victim in

---

[16] Pennsylvania Suggested Standard Jury Instructions for the castle doctrine recognize that instructions on justification "are extremely complex and can be very confusing." Pa. SSJI (Crim) 9.501A (Subcommittee Note). "Not all sections may be supported by the provable facts and it is intended that the court should select only those sections necessary to the jury's consideration." *Id.*

dealing drugs or whether it was related to the victim's theft of Appellant's drugs which were intended for sale is immaterial. Either way, the confrontation was related to criminal activity within the house and the conduct constituted a misdemeanor or felony.

The castle doctrine presumption also does not apply unless the person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within a dwelling, or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling. 18 Pa.C.S.A. § 505(b)(2.1)(i). In the present case, testimony clearly established that the victim did not forcefully enter the residence. The victim peacefully entered the residence while Appellant was asleep. Further, the victim was not in the process of forcefully entering the residence when the shooting occurred. He had already been inside the residence. Additionally, there was no testimony to suggest the victim was attempting to forcefully remove Appellant from the dwelling. While Appellant did testify that the victim poked him once in the chest while they were inside the house, Appellant also testified that he left the residence to yell down to Dan Umble to come up and assist Appellant in kicking the victim off the property. After he was outside, Appellant claimed the victim reached for a gun and he shot in self-defense. Appellant never testified that the victim was attempting to forcefully remove him from the residence.

Nevertheless, the court did instruct the jury on legal justification for use of deadly force in self-defense. (N.T. at 843-47). Included in that instruction, the jury was told that Appellant was not obligated to retreat from his own dwelling. *Id.* at 847. Furthermore, while instructing the jury on voluntary manslaughter, the court again instructed the jury that Appellant was not obligated to retreat from his own dwelling. *Id.* at 842.

39

For these reasons, the trial court properly charged the jury on justification for use of deadly force in self-defense, while declining to charge on the castle doctrine instruction.

## V. The Trial Court Did Not Err by Allowing the Commonwealth to Introduce Evidence of Prior Drug Dealing Activity by Appellant.

Appellant further argues the trial court erred by allowing the Commonwealth to introduce evidence of his prior drug dealing activity because it was not relevant as to why and how the victim was shot, it was unfairly prejudicial, and it was merely a pretext by the Commonwealth to insert irrelevant and unfairly prejudicial bad character testimony into the trial. *See* Statement.

On January 31, 2017, the Commonwealth filed a Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Rule of Evidence 404, seeking to introduce testimony showing that Appellant was operating a drug-dealing enterprise. *See* Notice. The Commonwealth asserted that in the days preceding his death, the victim "had attempted to undermine the [Appellant's] role in the drug-dealing enterprise and/or started a competing drug-dealing enterprise." *Id.* This testimony and evidence would be offered "not to show the [Appellant's] bad character, but to show the *res gestae* of the offense at issue, and to show the [Appellant's] motive and intent to murder Julius Dale." *Id.* Appellant objected, claiming the assertion was speculation that would confuse the jurors, and its probative value was outweighed by its potential prejudicial effect. *See* Defendant's Memorandum in Opposition, page 5.

The Pennsylvania Rules of Evidence permit the introduction of crimes, wrongs, or other acts as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

40

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3) Notice in a Criminal Case. In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

Prior wrongs and acts are admissible when offered for a proper evidentiary purpose. *Commonwealth v. Ardinger*, 839 A.2d 1143, 1144-46 (Pa. Super. 2003). In a criminal case, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice. Pa.R.E. 404(b)(2). Evidence of other crimes is not precluded merely because it prejudices the defense. *Commonwealth v. Brown*, 414 A.2d 70, 75 (Pa. 1980). All evidence of guilt is prejudicial to the defense and the rules of evidence only prohibit unfair prejudice. *Commonwealth v. Hairston*, 84 A.3d 657, 670 (Pa. 2014).

Factors to consider in establishing similarity between the charged offense and extraneous or collateral offenses for introduction of such evidence are the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed. *Commonwealth v. Cain*, 29 A.3d 3, 7 (Pa. Super. 2011). "In order for evidence of prior bad acts to be admissible as evidence of motive, the prior bad acts 'must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances.'" *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004) (quoting *Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002)).

"Where evidence of a defendant's prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Solano*, 129 A.3d 1156, 1178 (Pa. 2015) (citing *Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002)). When examining the potential for undue prejudice arising from admission of extraneous offense or collateral crimes evidence, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence. *Hairston*, 84 A.3d at 666 (citing Pa.R.E. 404(b) cmt; *Commonwealth v. Dillon*, 925 A.2d 131, 141 (Pa. 2007)). "Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2012) (internal quotations and citation omitted).

In *Commonwealth v. Collins*, 70 A.3d 1245 (Pa. Super. 2013), the Superior Court held that evidence the defendant and victim were rival drug dealers was admissible evidence of prior bad acts to establish motive at a murder trial. *Id.* at 1251-52. The evidence was highly probative of motive and the jury was instructed they may only consider the evidence that defendant was involved in the drug trade to establish motive. *Id.* at 1252. Likewise, in *Commonwealth v. Johnson*, 838 A.2d 663 (Pa. 2003), evidence of the defendant's involvement in drug trafficking was admissible to establish his motive at his murder trial because the testimony showed a diversion of drug sales from one group to the other, knowledge on the part of both men that there was competition, and the defendant's awareness that the victim was his rival. *Id.* at 671-72.

Testimony that the defendant admitted to attacking the victim because the victim had ripped him off or burnt him in prior drug transactions was admissible to establish the defendant's motive for the killing, and the testimony was not unduly prejudicial merely because it was

42

damaging to the defendant's case. *Commonwealth v. Fisher*, 769 A.2d 1116, 1128 (Pa. 2001).

Evidence of prior bad acts may also be introduced to show that motive for the killing was not

self-defense. *Commonwealth v. Gelber*, 594 A.2d 672, 680 (Pa. Super. 1991); s*ee also*

*Commonwealth v. Jones*, 668 A.2d 491, 499-502 (Pa. 1995) (activities of a drug distribution

organization led by the defendant was admissible in a murder prosecution to prove motive for

killing the victim because the evidence showed the drug organization enforced internal discipline

with acts of violence and in this instance resorted to murder to settle an internal dispute).

In *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017), the Pennsylvania Supreme Court

confirmed this exception to the general inadmissibility of other crimes evidence where there is a

logical connection between the proffered prior bad acts and the underlying charged crime. *Id.* at

1124-26. In *Hicks*, the Supreme Court found that the trial court did not abuse its discretion in

admitting Rule 404(b) evidence regarding other crimes, wrongs or acts by appellant where it

tended to establish the elements of first-degree murder, the probative value of the evidence to the

Commonwealth's largely circumstantial case clearly outweighed any unfair prejudicial effect,

and it was properly limited by the trial court's cautionary instructions to the jury. *Id.* at 1129.

Presently, the trial court permitted the Commonwealth to introduce evidence of drug

dealing activities involving the victim and Appellant because those activities were the alleged

motive for the homicide, and they would refute any suggestion of self-defense.[17] This evidence

---

[17] Appellant conceded in his pretrial memorandum that there was evidence which "arguably involve[s] [Appellant's] alleged drug-dealing activity and/or operating a drug-dealing enterprise." *See* Defendant's Memorandum in Opposition, page 6. Appellant further acknowledged in his Motion in Limine that there was evidence the victim and Appellant were partners in the drug trade, and Appellant accused the victim of betrayal shortly before the killing for taking some drugs belonging to Appellant and going behind Appellant's back to buy drugs from another source. *See* Motion in Limine, ¶¶ 47, 59-60.

43

was highly probative to show the *res gestae* of the offense, to prove motive, and to prove intent. Moreover, the court determined the probative value outweighed any prejudicial effect it may have on Appellant. Additionally, the court provided an appropriate cautionary instruction to the jury. (N.T. at 133-34). Therefore, the trial court properly admitted this prior bad acts evidence.

## CONCLUSION

Based on the foregoing, the trial court properly denied Appellant's request for a trial continuance so Appellant could obtain new counsel. The court also properly allowed the admission of intercepted prison visit conversations into evidence, denied Appellant's motion to suppress his custodial interrogation, declined to charge the jury pursuant to Appellant's requested castle doctrine instruction, and allowed evidence of prior drug dealing activity by Appellant. Therefore, this appeal should be denied.

BY THE COURT:

Date: ___December 20, 2017___
DONALD R. TOTARO, JUDGE

Copies:     Travis S. Anderson, Esquire, Assistant District Attorney
            Christopher M. Tallarico, Esquire, Counsel for Appellant

44